**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ____________________

MELANIE AMAYA, Individually and for Others Similarly Situated,

Plaintiff,

v.

HIGHRIDGE MEDICAL, LLC,

Defendant.

---

# ORIGINAL COLLECTIVE ACTION COMPLAINT

---

## Summary

1. Melanie Amaya (Amaya) brings this collective action to recover unpaid wages and other damages from Highridge Medical, LLC (Highridge) under the Fair Labor Standards Act (FLSA).

2. Highridge employed Amaya as one of its Hourly Employees (defined below).

3. Amaya and the other Hourly Employees regularly work more than 40 hours a week.

4. Highridge pays Amaya and the other Hourly Employees by the hour, plus various forms of additional remuneration on top of the workers' base hourly rates of pay.

5. But Highridge does not pay them for all overtime wages owed under the FLSA when they work over 40 hours in a workweek.

6. Instead, Highridge excludes various forms of compensation from Amaya's and the Hourly Employees' regular rates of pay, such as on-call premium pay and other categories of remuneration (Highridge's "Regular Rate Policy").

7. As a result of Highridge's Regular Rate Policy, it does not pay Amaya and the other Hourly Employees all overtime wages owed at the correct rate of pay as required under the FLSA.

8. Highridge also requires Amaya and other Hourly Employees to perform compensable work that is not captured on their timekeeping records and is not paid by Highridge (Highridge's "Off the Clock Policy").

9. This off-the-clock work includes, but is not limited to, requiring Amaya and other Hourly Employees to respond to work emails before their clock in and after they clock out, as well as computer loading times that require Hourly Employees like Amaya to boot up their work computer and load various computer programs before they can clock in for work.

10. Such off-the-clock work occurs daily, including during workweeks in which Amaya and other Hourly Employees work at least 40 on-the-clock hours, resulting in unpaid overtime wages under the FLSA.

11. Highridge further required Amaya and, upon information and belief required other Hourly Employees, to perform work that was not properly captured on Highridge's timekeeping system and thus went unpaid in full, including a substantial number of unpaid overtime hours worked.

12. For example, during Amaya's final week of work in January 2026, Amaya worked upwards of 15 and 16 hours per day across 3 days of work, for a total of approximately 45-to-48 total hours in the week. Highridge, however, only paid Amaya based on a presumed 8-hour workday for each of those three days rather than her actual number of hours worked, resulting in unpaid overtime wages.

**Jurisdiction & Venue**

13. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA. *See* 29 U.S.C. § 216(b).

14. This Court has general personal jurisdiction over Highridge because Highridge is a limited liability company that maintains its principal place of business in Westminster, Colorado. *See Smith v. Bloom TV LLC*, No. 1:24-cv-02901-CNS-SBP, 2025 WL 3443078, at *6 (D. Colo. Dec. 1, 2025) (finding general personal jurisdiction over an LLC because its principal place of business was located within the forum).

15. Venue is proper in this Court because Highridge resides in this District and within this Division. 28 U.S.C. § 1391(b)(1).

16. Venue is also proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division, including Highridge's decision to exclude various forms of pay from the regular rate and Highridge's decision not to pay all hours worked by Amaya. 28 U.S.C. § 1391(b)(2). Additionally, Highridge employs numerous similarly situated Hourly Employees (*i.e.*, potential opt-in plaintiffs to this suit) in this District.

17. Amaya brings these FLSA claims as a nation-wide collective action (not including current or former employees who worked for Highridge in California). The only venues where this nationwide collective action lawsuit can be brought are venues which can exercise general personal jurisdiction over Highridge. *See, e.g., Vanegas v. Signet Builders, Inc.*, 113 F.4th 718 (7th Cir. 2024) ("A nationwide collective of [defendant's] workers could proceed in [a state] which enjoys general jurisdiction over [defendant], with no loss of efficiency."); *Fischer v. Fed. Express Corp.*, 42 F.4th 366 (3d Cir. 2022) ("potential plaintiffs retain the ability to bring nationwide collective actions in a court that can exercise general personal jurisdiction over their employer"); *Canaday v. Anthem Cos., Inc.*, 9 F.4th 392 (6th Cir. 2021) (a plaintiff may "use general personal jurisdiction to file a nationwide action in the state in which the company is incorporated or does most of its business.").

18. Highridge's principal place of business is located in Westminster, Colorado. As such, the District of Colorado enjoys general personal jurisdiction over Highridge and is one of only two venues where Amaya can bring this nationwide collective action.[1]

19. Amaya would not be allowed to bring this nationwide collective action in the venue where she performed work for Highridge, in Austin, Texas. That is because the United States District Court for the Western District of Texas, which oversees Austin, Texas, would not be able to exercise general personal jurisdiction over Highridge or the claims of Hourly Employees who worked for Highridge in locations outside of Texas. *See Adams v. Absolute Consulting, Inc.*, No. 6:20-cv-01099-ADA-DTG, 2023 WL 3138043,

[1] The other potential venue which can exercise general personal jurisdiction over Highridge is Delaware, Highridge's state of incorporation.

2023 U.S. Dist. LEXIS 73313, at *11-12 (W.D. Tex. Apr. 27, 2023), *adopted at* 2023 WL 3874326, 2023 U.S. Dist. LEXIS 98917 (W.D. Tex. June 7, 2023) (agreeing with *Fischer* and applying *Bristol-Myers* to FLSA claims of out-of-state plaintiffs).

20. Accordingly, venue is proper and appropriate in this Court.

## **Parties**

21. Highridge employed Amaya as a non-exempt account manager in Austin, Texas from approximately September 2022 to January 2026.

22. Highridge classified Amaya as non-exempt and paid her by the hour, plus additional forms of remuneration.

23. Highridge paid Amaya a base hourly rate of approximately $33 per hour.

24. Amaya worked over 40 hours per week for Highridge virtually every workweek within the relevant time period.

25. Highridge, however, did not pay Amaya for all overtime hours she worked at the correct rate of pay.

26. Instead, under Highridge's Regular Rate Policy, Highridge improperly excluded various forms of remuneration from Amaya's regular rate of pay, including but not limited to on-call premium pay.

27. Each of these categories of remuneration paid to Amaya is presumed to be included into the regular rate of pay. *See* 29 U.S.C. § 207(e).

28. However, these additional forms of remuneration were not properly included into Amaya's regular rate of pay during workweeks in which she worked over 40 hours.

29. By failing to properly incorporate these forms of remuneration into the regular rate, Highridge under-calculated Amaya's overtime rate of pay and, as a result, failed to pay Amaya all overtime wages owed.

30. Additionally, Amaya was required to work, on average, 2-to-5 minutes before she could clock in and an additional 2-to-5 minutes after she clocked out performing compensable work. Amaya estimates she worked 5 days per week during her normal workweeks, resulting in, on average, unpaid wages of between 0.167 and 0.417 off-the-clock hours during each workweek. During at least one workweek, these off-the-clock hours occurred when Amaya worked more than 40 on-the-clock hours, resulting in unpaid overtime wages.

31. Likewise, Highridge frequently required Amaya to clock out for her 30-minute meal periods but did not actually authorize and permit Amaya to take *bona fide* meal breaks during which she was relieved of all work duties.

32. Rather, Highridge required Amaya to work through her unpaid meal periods of approximately 30 minutes, during which Amaya generated time-stamped work activity from which Highridge knew, or should have known through the exercise of reasonable diligence, that Amaya was performing her principal job duties.

33. Despite knowing or otherwise having constructive knowledge that Amaya did not receive *bona fide* meal breaks each workday, Highridge failed to pay Amaya all wages owed for such work hours.

34. Highridge required Amaya to work through her unpaid meal periods during workweeks in which she worked over 40 total hours, resulting in further unpaid overtime wages.

35. And Highridge further required Amaya to perform work while off-the-clock, including unpaid overtime work, during her final workweek of work in January 2026.

36. During her final workweek, Amaya worked approximately 45-to-48 total hours, consisting of 3 workdays lasting 15-to-16 hours each day.

37. Highridge, however, only paid Amaya for 8 hours of work each day, resulting in unpaid overtime wages.

38. Amaya's written consent is attached hereto as **Exhibit 1**.

39. The other Hourly Employees are likewise subject to Highridge's Regular Rate Policy and are required to perform work while off-the-clock.

40. Amaya brings her claims as a collective action pursuant to 29 U.S.C. § 216(b).

41. The putative collective of similarly situated employees is defined as:

> **All current and former hourly Highridge employees in the United States (not including employees based in California) who earned additional forms of remuneration on top of their base hourly rates, including but not limited to non-discretionary bonuses, on-call premium pay, and "MI" pay, at any time from 3 years before the filing of this Complaint through final resolution of this Action (the "Hourly Employees").**

42. Highridge is a Delaware limited liability company with its principal place of business located in Westminster, Colorado.

43. Highridge may be served with process through its registered agent: **C T Corporation System, 7700 East Arapahoe Road, Suite 220, Centennial, Colorado 80112**.

## FLSA Coverage

44. At all relevant times, Highridge was an "employer" within the meaning of the FLSA. *See* 29 U.S.C. § 203(d).

45. At all relevant times, Highridge was an "enterprise" within the meaning of the FLSA. *See* 29 U.S.C. § 203(r).

46. At all relevant times, Highridge was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of the FLSA because it had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce, including the myriad categories of items sold in Highridge's stores. *See* 29 U.S.C. § 203(s)(1).

47. At all relevant times, Highridge has had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

48. At all relevant times, the Hourly Employees were Highridge's "employees" within the meaning of the FLSA. *See* 29 U.S.C. § 203(e).

49. At all relevant times, the Hourly Employees were engaged in commerce or in the production of goods for commerce.

## Facts

50. Highridge sells medical devices throughout the United States.

51. To meet its business objectives, Highridge employs remote workers such as Amaya and the other Hourly Employees.

52. For example, Amaya worked for Highridge as a non-exempt account manager from approximately September 2022 until January 2026 in Austin, Texas.

53. Amaya's primary job duties included managing various accounts, working with sales representatives and teams on various client accounts, training new-hires, and working with Highridge's field inventory team to ensure customer satisfaction.

54. Amaya was Highridge's non-exempt, hourly employee.

55. Amaya worked over 40 hours per week virtually every workweek within the relevant time period.

56. At the end of her employment, Highridge paid Amaya a base hourly rate of approximately $33 per hour.

57. Throughout the relevant time period, Highridge also paid Amaya various amounts in addition to her base hourly rates of pay, including but not limited to remuneration categorized as on-call premium pay.

58. Highridge similarly paid Hourly Employees' additional remuneration on top of their base hourly rates of pay, including but not limited to non-discretionary bonuses, on-call premium pay, and remuneration designated as "MI" pay.

59. These forms of pay are presumptively included into the regular rate of pay for purposes of calculating overtime pay under the FLSA.

60. However, pursuant to Highridge's Regular Rate Policy, Highridge failed to properly include these various categories of compensation into Amaya's and other Hourly Employees' regular rates of pay, including during workweeks in which Amaya and the Hourly Employees worked over 40 total on-the-clock hours.

61. Highridge's Regular Rate Policy therefore resulted in under-calculation of Amaya's and other Hourly Employees' overtime rates of pay and, thus, a failure to pay all overtime wages owed under the FLSA.

62. Highridge knew Amaya worked over 40 on-the-clock hours based on its own internal timekeeping records.

63. Throughout her employment, Amaya worked over 40 hours per week virtually every workweek.

64. Amaya also earned additional remuneration in the form of on-call premium pay and other categories of remuneration during workweeks in which she worked over 40 total hours.

65. Highridge failed to properly include the on-call premium pay into Amaya's regular rate during such workweeks in which she worked over 40 hours, resulting in underpayment of overtime wages.

66. Highridge also required Amaya to perform work while off-the-clock during workweeks in which she worked over 40 total hours, for which Highridge did not compensate Amaya.

67. This off-the-clock work included, *inter alia*, requiring Amaya to turn on, boot up, and load various computer programs on her work computer before she could clock in for the day.

68. These tasks were necessary and principal for Amaya's primary work duties—she could not perform the majority of her job duties unless she turned on her work computer and opened various work programs.

69. Highridge knew, or with the reasonable exercise of diligence would know, that Amaya was performing such work while off-the-clock because it knows workers like Amaya cannot clock in until they turn on their work computers and load these various computer programs. These programs are automated and Highridge has no difficulty

determining the average amount of time it takes to turn on, boot up, and load these various programs each workday.

70. Highridge also knows Amaya performs these tasks while off-the-clock because she typically does so at the behest of Highridge's supervisory/managerial employees.

71. Highridge also required Amaya to perform compensable work during her unpaid meal periods.

72. Highridge also failed to pay Amaya for all hours worked during her final workweek, resulting in unpaid overtime.

73. Such unpaid "off-the-clock" work occurred during workweeks in which Amaya worked over 40 on-the-clock hours, thus resulting in unpaid overtime wages.

74. Highridge knew, or should have known, that Amaya was performing compensable work during her unpaid meal periods and during her final workweek because Amaya's time-stamped work activity demonstrates she was actively performing her principal job duties during such unpaid time.

75. And while exact job duties and precise locations worked may differ, Amaya and the other Hourly Employees are subject to Highridge's same or similar unlawful Regular Rate Policy.

76. Highridge runs its payroll for Amaya and the other Hourly Employees using common accounting and payroll software.

77. Highridge's common accounting and payroll software utilizes uniform calculations to calculate non-exempt employees' regular rates of pay and overtime rates of pay for its employees throughout the United States.

78. As a result of Highridge's common and uniform payroll systems and pay calculation formulas, Highridge subjects Amaya and the other Hourly Employees to its Regular Rate Policy wherein Highridge fails to properly include various forms of remuneration from the regular rate.

79. Despite knowing the other Hourly Employees regularly work more than 40 hours a workweek, Highridge does not pay them for all overtime hours worked at the correct overtime rates of pay.

80. Instead, like Amaya, Highridge fails to include various forms of remuneration into the Hourly Employees' regular rates of pay, including forms of remuneration bearing similar pay codes as those paid to Amaya.

81. For instance, Highridge failed to include non-discretionary bonuses, on-call premium pay, and "MI" pay from Hourly Employees' regular rates of pay.

82. Highridge did so during workweeks in which Hourly Employees worked over 40 on-the-clock hours.

83. As a result of Highridge's failure to properly include all such remuneration into the regular rates of the other Hourly Employees, Highridge fails to pay them all overtime wages owed when they work over 40 hours in a week and earn such additional forms of remuneration.

84. Like Amaya, Highridge requires the other Hourly Employees to perform work while off-the-clock that is not compensated.

85. Highridge does so during workweeks in which the Hourly Employees work at least 40 on-the-clock hours, resulting in hours worked over 40 that go uncompensated by Highridge.

86. Highridge knows, or with the reasonable exercise of diligence would know, that Hourly Employees perform such “off-the-clock” work because Highridge has time-stamped work activity demonstrating work performed by Hourly Employees outside of their official time records.

87. Amaya and the other Hourly Employees are therefore denied overtime pay, at the correct rate of pay, for all compensable overtime work performed during workweeks in which they work over 40 hours.

88. Highridge’s violations of the FLSA are willful, carried out in bad faith, and caused significant damage to Amaya and the other Hourly Employees.

**FLSA Collective Action Allegations**

89. Amaya brings her FLSA claims as a nationwide collective action on behalf of herself and the other Hourly Employees throughout the United States (but not including California) pursuant to 29 U.S.C. § 216(b).

90. Like Amaya, the other Hourly Employees are victimized by Highridge’s Regular Rate Policy.

91. Other Hourly Employees worked with Amaya and indicated they were paid in the same manner, received similar forms of compensation, and were subject to Highridge’s same illegal Regular Rate Policy and off-the-clock requirements.

92. Based on her experience with Highridge, Amaya is aware Highridge’s illegal Regular Rate Policy was imposed on other Hourly Employees.

93. Based on her experience with Highridge, Amaya is aware Highridge required other Hourly Employees to perform a substantial amount of compensable work, including overtime work, while “off-the-clock” and without pay.

94. The Hourly Employees are known to Highridge and can be readily identified through Highridge's business and personnel records.

95. The Hourly Employees are similarly situated in the most relevant respects.

96. Even if their precise job titles, exact duties, and locations might vary, these differences do not matter for the purposes of determining their entitlement to overtime pay for all hours worked at the proper premium rates.

97. The *relevant* inquiry is whether the Hourly Employees were required to work under and were paid according to Highridge's Regular Rate Policy and/or off-the-clock requirements.

98. Therefore, the specific job titles or precise job locations of the various Hourly Employees do not prevent collective treatment.

99. Rather, the putative collective of Hourly Employees is held together by Highridge's illegal Regular Rate Policy and/or off-the-clock requirements, which systematically deprived Amaya and the other Hourly Employees of all overtime wages owed at the correct premium rates.

100. Highridge's records show the number of hours the Hourly Employees worked "on the clock" each workday and workweek.

101. Highridge's records likewise show all forms of compensation paid to the Hourly Employees each workweek in which they worked over 40 on-the-clock hours.

102. Highridge's records show whether or not it incorporates all forms of remuneration into the regular rate each workweek in which its employees worked on-the-clock overtime hours.

103. Highridge's records likewise show whether Amaya and the other Hourly Employees are performing work for which they are not paid for all such work hours.

104. The back wages owed to Amaya and the other Hourly Employees can therefore be calculated using the same formula applied to the same records.

105. Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Highridge's records, and there is no detraction from the common nucleus of liability facts.

106. Therefore, the issue of damages does not preclude collective treatment.

107. And Amaya's experiences are therefore typical of the experiences of the other Hourly Employees.

108. Amaya has no interest contrary to, or in conflict with, the interests of other Hourly Employees that would prevent collective treatment.

109. Like each Hourly Employee, Amaya has an interest in obtaining the unpaid wages owed to her under the FLSA.

110. Amaya and her counsel will fairly and adequately represent the Hourly Employees and their interests.

111. Amaya retained counsel with significant experience in handling complex class and collective action litigation.

112. Absent this collective action, many Hourly Employees will not obtain redress for their injuries, and Highridge will reap the unjust benefits of violating the FLSA.

113. Further, even if some of the Hourly Employees could afford individual litigation against Highridge, it would be unduly burdensome to the judicial system.

114. Indeed, the multiplicity of actions would create hardship to the Hourly Employees, the Court, and Highridge.

115. Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Employees' claims.

116. The questions of law and fact that are common to each Hourly Employee predominate over any questions affecting solely the individual members.

117. The common questions of law and fact include:

a. Whether Highridge paid additional remuneration to the Hourly Employees on top of their base hourly rates of pay;

b. Whether Highridge failed to properly include all remuneration into the Hourly Employees' regular rates of pay;

c. Whether Highridge's failure to properly include all remuneration into the regular rate resulted in under-calculation of the overtime rate of pay for Hourly Employees;

d. Whether Highridge required the Hourly Employees to perform compensable work while off-the-clock;

e. Whether Highridge knew or, with the reasonable exercise of diligence would have known, that Hourly Employees performed compensable work while off-the-clock;

f. Whether Highridge paid the Hourly Employees for their off-the-clock work;

g. Whether Highridge failed to pay the Hourly Employees overtime at rates not less than 1.5 times their regular rates of pay for all hours worked in excess of 40 in a workweek;

h. Whether Highridge's decision not to pay the Hourly Employees all time-and-a-half overtime wages at the correct rate of pay was made in good faith; and

i. Whether Highridge's violations were willful.

118. As part of its regular business practices, Highridge intentionally, willfully, and repeatedly violated the FLSA.

119. Highridge's illegal policies deprived Amaya and the other Hourly Employees of the earned wages, including overtime wages, they are owed under the FLSA.

**<u>Highridge's FLSA Violations Were Willful</u>**

120. Highridge knew it was subject to the overtime provisions of the FLSA.

121. Highridge knew the FLSA required it to pay non-exempt employees, including Amaya and the other Hourly Employees, overtime wages at rates not less than 1.5 times their regular rates of pay, based on all remuneration, for all hours worked after 40 in a workweek.

122. Highridge knew Amaya and the other Hourly Employees worked more than 40 hours in at least one workweek during the 3 years before this Complaint was filed because it required them to report their "on-the-clock" hours worked.

123. Highridge knew Amaya and the other Hourly Employees are non-exempt employees entitled to overtime wages under the FLSA and Labor Code.

124. Highridge knew it paid the Hourly Employees on an hourly basis.

125. Highridge knew it paid the Hourly Employees additional remuneration beyond their base hourly rates of pay.

126. Highridge knew that all remuneration is presumed to be included into the regular rate under the FLSA.

127. Highridge knew it improperly excluded various forms of compensation from the Hourly Employees' regular rates of pay, and did so during workweeks in which the Hourly Employees worked over 40 hours in a workweek.

128. Highridge's failure to pay Amaya and the other Hourly Employees overtime wages as a result of its failure to include all remuneration into the regular rate was neither reasonable nor was its decision to exclude remuneration from the regular rate made in good faith.

129. Thus, Highridge knew, should have known, or recklessly disregarded whether it failed to pay Amaya and the other Hourly Employees all overtime wages owed.

130. Highridge likewise knew it required Amaya and the other Hourly Employees to perform additional work that was not captured on their official timekeeping records, including computer boot-up time, work performed during unpaid meal periods, and other work tasks.

131. Highridge's failure to pay Amaya and the other Hourly Employees for all overtime hours worked, at the correct rate of pay, was neither reasonable nor was its decision to decline payment for these hours worked made in good faith.

132. Highridge knew, should have known, or recklessly disregarded whether its conduct described in this Complaint violated the FLSA.

133. Highridge knowingly, willfully, and/or in reckless disregard carried out its illegal policies that systematically deprived Amaya and the other Hourly Employees of their earned overtime wages in violation of the FLSA.

134. In sum, Highridge's violations were willful, carried out in bad faith, and caused significant damage to Amaya and the other Hourly Employees.

## Cause of Action

### Failure to Pay Overtime Wages Under the FLSA Pursuant to 29 U.S.C § 216

135. Amaya brings her FLSA claims on behalf of herself and the other Hourly Employees pursuant to 29 U.S.C. § 216(b).

136. Amaya brings this Action as a nationwide collective action (not including employees who worked for Highridge in California).

137. Highridge violated, and is violating, the FLSA by employing non-exempt employees (Amaya and the other Hourly Employees) in a covered enterprise for workweeks in excess of 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay—based on all remuneration—for all hours worked in excess of 40 each workweek, including hours worked "off the clock."

138. Highridge's unlawful conduct harmed Amaya and the other Hourly Employees by depriving them of the overtime compensation they are owed.

139. Accordingly, Highridge owes Amaya and the other Hourly Employees the difference between the overtime wages actually paid and the proper overtime wages actually earned.

140. Because Highridge's FLSA violations were willful, Highridge owes these wages for at least the past 3 years.

141. Because Highridge's FLSA violations were not committed in good faith, Highridge is also liable to Amaya and the other Hourly Employees for an additional amount equal to all unpaid wages as liquidated damages.

142. Finally, Amaya and the other Hourly Employees are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## Jury Demand

143. Amaya hereby demands a jury trial on all claims and issues, as she and the other Hourly Employees are entitled to a jury.

## Relief Sought

WHEREFORE, Amaya, individually and on behalf of the other Hourly Employees, seeks the following relief:

a. An Order designating this lawsuit as a collective action and authorizing notice to the Hourly Employees, allowing them to join this action by filing a written notice of consent to sue;

b. Damages and restitution according to proof at trial for all unpaid wages and other injuries, as provided by the FLSA;

c. A Declaratory Judgment that Highridge violated the FLSA and public policy as alleged herein;

d. An Order finding Highridge liable to Amaya and the other Hourly Employees for all unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

e. An equitable accounting to identify, locate, and restore all current and former employees the wages and compensatory damages they are due, with interest thereon at the highest rates allowable by law;

f. Judgment awarding Amaya and the other Hourly Employees all unpaid overtime wages, liquidated damages, and any other penalties available under the FLSA;

g. An Order awarding attorney's fees, costs, and expenses as provided by the FLSA and/or other applicable law;

h. Pre- and post-judgment interest at the highest applicable rates; and

i. Such other and further relief as may be necessary and appropriate.

Date: August 28, 2026

Respectfully submitted,

*/s/ William M. Hogg*

**Douglas Han**
California Bar No. 232858
Washington State Bar No. 59429
**William M. Hogg**
Texas Bar No. 24087733
California Bar No. 338196
**JUSTICE LAW CORPORATION**
751 N. Fair Oaks Ave., Ste. 101
Pasadena, California 91103
Tel: (818) 230-7502
Fax: (818) 230-7259
dhan@justicelawcorp.com
whogg@justicelawcorp.com

*Counsel for Amaya & the Hourly Employees*